220 F.2d 3
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
KOHLER COMPANY, Respondent.
Vernon BICHLER, Clarence J. Wield, Raymond E. Majerus, Vernon Clark, James H. Lacy, Donald L. Ramaker, John Zanskas, Raymond W. Reseburg, Eugene A. Pfister, Robert Kretsch, Robert E. Wilcox and James C. Dekker, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 11272.
 No. 11283.
 United States Court of Appeals, Seventh Circuit.
 March 7, 1955.
 Rehearing Denied April 7, 1955.
 
 COPYRIGHT MATERIAL OMITTED David P. Findling, Associate Gen. Counsel, Irving M. Herman, Atty., George J. Bott, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Samuel M. Singer, Atty., N. L. R. B., Washington, D. C., for National Labor Relations Board.
 William F. Howe, Washington, D. C., Lyman C. Conger, Edward J. Hammer, Kohler, Wis., Jerome Powell, Gall, Lane & Howe, Washington, D. C., for Kohler Co.
 Max Raskin, Milwaukee, Wis., David Rabinovitz, Sheboygan, Wis., of counsel, for Vernon Bichler and others.
 Before MAJOR, FINNEGAN and SWAIM, Circuit Judges.
 SWAIM, Circuit Judge.
 
 
 1
 These two cases involve two related matters which have been consolidated for all purposes by the order of this court. The first matter is a petition by the National Labor Relations Board, hereinafter referred to as the Board, for enforcement of its order against the Kohler Company, hereinafter referred to as the Company. The second matter is a petition by twelve former employees of the Company to review and set aside that part of the Board's order which dismissed the allegations of the complaint that the Company by discriminatively discharging the twelve employees violated Sections 8(a) (3) and (1) of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq.
 
 
 2
 The Company has its principal manufacturing plant, office and place of business at Kohler, Wisconsin. It is engaged in the manufacture, sale and distribution of plumbing fixtures, heating equipment, electrical plants, air-cooled engines and precision parts, and it annually ships finished products valued in excess of $1,000,000 to points outside of Wisconsin.
 
 
 3
 The Board adopted the findings of the Trial Examiner that the Company, through its supervisory employees, had engaged in the coercion and restraint of its employees in violation of Section 8(a) (1) of the Act and that it had discriminatorily discharged employee Edward Ertel in violation of Section 8(a) (3) and (1) of the Act. Again following the findings and recommendations of the Trial Examiner, the Board dismissed that part of the complaint which alleged violation of Sections 8(a) (3) and (1) in the discharge of the twelve employees.
 
 
 4
 From 1934 and until the spring of 1951 the Kohler Workers Association, hereinafter referred to as KWA, was the bargaining agent of the Company's employees. In 1951 the United Automobile Workers of America, CIO, hereinafter referred to as UAW, challenged the right of KWA to represent the employees by a Board-conducted election which was held pursuant to a petition by the UAW. This election was won by KWA. A subsequent election, held in June 1952 after an intensive organizing campaign by UAW, was won by UAW, which was then certified by the Board as the bargaining representative. Shortly thereafter KWA affiliated with UAW.
 
 No. 11272
 
 5
 The Company contends that several of the allegations in the complaint were not supported by a timely charge as required by Section 10(b) of the Act. Section 10(b) provides that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge * * *." Three charges were filed with the Board: one on November 2, 1951, and two on May 5, 1952. All of the allegations which the Company insists were not based on a timely charge concerned allegedly coercive statements made by Company supervisors to its employees. Although they were made at different times, all of these statements except one were made within six months of at least one of the charges. Since all the charges are substantially the same, there is no question of timeliness except as to the one statement which was made subsequent to the date of all the charges. The real question concerns whether or not these statements were properly included in the Board's complaint when the charges alleged improper discharges and, generally, that "by these acts and by other acts and conduct the Company * * * did interfere with, restrain and coerce its employees in the exercise of their rights guaranteed in Section 7 of the Act."
 
 
 6
 Several early cases held that, because Section 10(b) gives the Board the power to issue a complaint only after a charge has been filed, the Board's complaint must be limited to the allegations of the charge. Joanna Cotton Mills v. N. L. R. B., 4 Cir., 176 F.2d 749; N. L. R. B. v. Hopwood Retinning Co., 2 Cir., 98 F.2d 97, 101. But the courts then began to interpret Section 10(b) as requiring something less than exact similarity between charge and complaint. It has been said repeatedly that the charge is not a pleading, being intended, rather, as an administrative step necessary to set the Board's investigatory process in motion. The charge should, therefore, be construed broadly so as to allow any specific allegations in the complaint that are of "the same general nature." N. L. R. B. v. Thomas Drayage & Rig Co., 9 Cir., 206 F.2d 857, 859-60; Indiana Metal Products Corp. v. N. L. R. B., 7 Cir., 202 F.2d 613, 619; N. L. R. B. v. Bradley Washfountain Co., 7 Cir., 192 F.2d 144, 149; N. L. R. B. v. Kingston Cake Co., 3 Cir., 191 F.2d 563, 567; Kansas Milling Co. v. N. L. R. B., 10 Cir., 185 F.2d 413, 415; N. L. R. B. v. Greater New York Broadcasting Corp., 2 Cir., 147 F.2d 337, 338; Consumers Power Co. v. N. L. R. B., 6 Cir., 113 F.2d 38, 42.
 
 
 7
 This court has gone far in calling for liberal construction of the charge. In N. L. R. B. v. Bradley Washfountain Co., 192 F.2d at page 149, we said: "The controversy between the Board and the employer begins with the complaint prepared by the Board. [Case cited.] Consequently it is without significance that the complaint was broader than the original charge. The latter called upon the Board to make inquiry and, if thought proper, to file a complaint. In pursuance of its administrative duty, the Board, in due course, issued its complaint and thereupon the controversy between the Board and respondent came into existence. Nothing that transpired before the filing of the complaint in anywise limited the right of the Board to include in it the specific charges which it contained."
 
 
 8
 The facts in the Bradley case, however, did not require as liberal a construction of the charge as do those in the present case. In the Bradley case the charge accused the company of making wage increases without consulting or giving notice to the union. In its complaint the Board alleged that the company had increased wages before an impasse had been reached in bargaining. The actual act charged was the same as that alleged in the complaint, but the circumstances that, it was claimed, made it an unfair labor practice were different.
 
 
 9
 The facts presented here are a bit more difficult. The charges accused the Company of discharging certain named employees, because of their active support of UAW, in violation of Sections 8(a) (3) and (1). The complaint alleged, inter alia, certain improper statements also in violation of Sections 8(a) (3) and (1). The only relationship between the discharges and the statements alleged in the complaint was that they were both found to be improper acts of the Company done in the course of a protracted struggle between the Company and UAW in an attempt to discourage employees from joining the union. They were totally different kinds of acts but done during a common endeavor for a single purpose. Is this relationship enough to say that the complaint was adequately supported by the charges? We have answered this question in the affirmative.
 
 
 10
 The Company argues that the charge must specify, at least in a general way, the acts alleged in the complaint so that the respondent will have "notice" of the charges being made against it. If there were no reason for limiting the complaint other than the respondent's right to notice, we would be forced to say that there need be no relationship at all between charge and ensuing complaint. As we said in N. L. R. B. v. Bradley Washfountain Co., supra, the legal proceeding between the Board and the respondent begins with the complaint. The complaint furnishes notice of the charges being made. It is doubtful that adoption of the Company's contention for strict adherence of the complaint to the charge would result in appreciably greater opportunities for preparedness on the part of respondents. We note that here the Company in its answer to the complaint simply denied all its allegations: those specifically mentioned in the charges as well as those not mentioned. Almost two months elapsed between the issuance of the complaint on January 28, 1953, and the beginning of hearings on March 17, 1953. No claim is made that the Company did not have time to prepare its defense or that it was prejudiced by the variance between the charge and the complaint.
 
 
 11
 To hold that the Board cannot include anything in a complaint that the respondent was not given notice of in a charge would greatly reduce the usefulness of the Board's investigatory function. A major reason for having the General Counsel of the Board take over and try the charging parties' case is to make it possible for single employees to enforce their rights in an area where that takes considerable money and experience. The courts should not defeat this purpose by insisting that the failure of the charging party to initially describe in detail all of the separate alleged unfair labor practices shall limit the issues to be alleged in the complaint and tried by the Board.
 
 
 12
 There must be some relationship between charge and complaint, however. Section 10(b) makes the filing of a complaint contingent upon the existence of a charge, and it has been consistently held that the Board cannot initiate a complaint on its own motion. N. L. R. B. v. National Licorice Co., 2 Cir., 104 F.2d 655, affirmed 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799. So long as the Board entered the controversy pursuant to a formal charge, it may allege whatever it finds to be a part of that controversy. But if it gets so completely outside of the situation which gave rise to the charge that it may be said to be initiating the proceeding on its own motion, then the complaint should fall as not supported by the charge.
 
 
 13
 The charges in this case alleged improper discharges because the Company was illegally trying to discourage establishment of the UAW in its plant. In the course of investigating the struggle between the Company and the UAW the Board discovered the statements here in question. The statements were made by Company supervisors in the course of the same controversy, and for the same purpose, as the discharges. Their discovery was a natural result of the investigation and they were properly included in the complaint.
 
 
 14
 The statement made by Boldt to Frerichs, which occurred after the last charge was filed, was also properly alleged in the complaint. N. L. R. B. v. Epstein, 3 Cir., 203 F.2d 482; N. L. R. B. v. Harris, 5 Cir., 200 F.2d 656. Before the six month limitation was added to Section 10(b) the Supreme Court held that the complaint could allege violations occurring after the charge. National Licorice Co. v. N. L. R. B., 309 U. S. 350, 60 S.Ct. 569, 84 L.Ed. 799. The six month limitation refers only to acts that occur before the charge and does not prohibit the inclusion of similar or related acts happening after the charge. Where, as here, the charge refers to part of a continuing pattern of conduct, there is no reason why the Board cannot allege specific acts which are part of that pattern although they occurred after the charge was filed. Boldt's statement was part of the pattern of Company coercion directed against the union's organizing campaign.
 
 
 15
 The Company argues that the record as a whole did not justify the Board's conclusion that these statements were coercive and in violation of Section 8 (a) (1). The Board's brief lists and describes the following alleged coercive statements made by supervisory employees of the Company to various employees, all of whom were active for the UAW. In September 1951 employee Clark, on complaining of being switched from one type of work to another, was urged by his foreman, Ross, not to "further antagonize the company." Ross explained that the Company's president had already raised the matter of Clark's UAW activities in connection with the subject of Clark's possible promotion. In January 1952 employee Lacy, while arguing with his foreman, Kolb, about certain wage deductions, remarked that "maybe when the CIO gets in here things will be a little different." Lacy was then told by Kolb that if the employees knew what was good for them they would leave the UAW out and be satisfied with what they had. In January or February of that year supervisor Strace called employee Wilcox into his office to ask Wilcox if he had put a UAW bulletin on the KWA bulletin board. When Wilcox denied that he had done this, Strace told him that he had better watch his step "because the company don't like your attitude." During the first quarter of 1952 supervisor Kolb told employees Reseburg and Pfister that "if a big union such as CIO came in the Company would step on us, make us work that much harder, we couldn't go down five minutes before wash up time, stuff like that." In March of that year foreman Govek told employee Wilcox that if the UAW got into the plant the men would probably be required to stay on the job until the last minute before taking their showers instead of being permitted to leave a few minutes earlier as was customary, and that they probably would lose their Christmas bonus. Govek also told Wilcox to watch his step because he "was under surveillance by roving guards." Early in May of that year supervisor Strace warned employee Frerichs that UAW would do him more harm than good — "you fellows are going to get yourselves in a lot of trouble." Later in the same month Frerichs and his partner, Nisporic, went to the showers a few minutes earlier than the customary fifteen minutes before punchout time. Foreman Govek followed them and told them that "when the CIO gets in here you fellows will have to work right up to the time, there won't be no getting down early, no getting down before the time." In August supervisor Boldt told Frerichs, "your ware is very poor, and with your position in the union you had better watch yourself or otherwise you won't be an enameler at the Kohler Company any more."
 
 
 16
 The Company called none of the accused supervisory employees nor any other witnesses to deny that the above described conversations had occurred.
 
 
 17
 When these undenied statements by the supervisory employees are considered in the light of the hostility of the Company toward the UAW, we think that the Board was justified in finding that the statements constituted a violation of Section 8(a) (1) in that they showed interference, restraint and coercion of the employees in the exercise of the rights guaranteed to them by Section 7 of the Act. As in the case of other triers of facts, the Board is entitled to draw all reasonable inferences from the evidence. N. L. R. B. v. SheddBrown Mfg. Co., 7 Cir., 213 F.2d 163.
 
 
 18
 The Company argues that there was no proper evidence showing a background of hostility toward the UAW. But throughout the contest between the KWA and the UAW the officers of the Company certainly made no attempt to conceal the fact that they did not want the UAW in the plant, and after the first election, which was won by the K WA, Conger, the Chairman of the Company's Management Committee, boasted: "We are the ones that won that election for you. We got on the air and put ads in the papers and we are certain that is what changed the picture, otherwise we might be meeting with somebody else right now."
 
 
 19
 The Board found that the Company had violated Section 8(a) (3) and (1) of the Act by discharging Edward Ertel because of his organizational activities in behalf of the UAW and, therefore, ordered his reinstatement with full seniority rights and back pay. The Company denies that it fired Ertel because of his union activity and contends that there was no substantial evidence before the Board upon which it could base such a finding. Ertel was already a member of the UAW when he came to work for the Company. He began immediately to distribute literature and buttons among the other employees, urging membership in the CIO. The record leaves no doubt about the fact that Ertel was one of the most active advocates of the UAW, and that the Company was well aware of it. The record also discloses behavior on the part of Ertel that might justify his discharge. The Board's task was to determine the Company's actual motive in discharging Ertel, and ours is to say whether or not there was any substantial evidence to support the Board's finding that Ertel was fired because of his union activity. Of course, if there is a substantial basis in fact for the Board's finding, we can review it no further. N. L. R. B. v. Columbian Enameling & Stamping Co., 306 U.S. 292, 59 S.Ct. 501, 83 L.Ed. 660; N. L. R. B. v. Cold Spring Granite Co., 8 Cir., 208 F.2d 163; N. L. R. B. v. Deena Products Co., 7 Cir., 195 F.2d 330.
 
 
 20
 The Hearing Officer's reasoning in concluding that the Company did not fire Ertel for proper cause was that other employees were guilty of the same infractions of which Ertel was accused, but they were not fired or even criticized. The Company claims that Ertel was fired because he refused to work overtime on most occasions when he was asked; he frequently left his work area; and he talked to other workers when they were supposed to be working. Ertel's foreman, Mertz, stated on cross-examination that several workers besides Ertel had objected to working overtime. He also stated that out of the six or seven occasions that overtime was requested, Ertel objected only three times, and of those three he actually worked two. Regarding the occasions upon which Ertel left his work area and talked to other workers, Mertz testified that he had specifically given other employees permission to visit other departments. Ertel testified that all of his visits away from his machine were while he had nothing to do because of a machine breakdown.
 
 
 21
 The conduct that distinguished Ertel from his fellow employees more than anything else was the extent of his activities in behalf of UAW. It was not unreasonable for the Board to conclude that this was the real reason he was fired when others who had been guilty of the same infractions of the Company's rules were not.
 
 
 22
 However, the Board's finding is supported by additional evidence of a less circumstantial nature. According to Ertel's testimony, which the Hearing Officer credited, various remarks were made by supervisory personnel to the effect that he had better stop talking about the union and, later, that such talk was the reason for his discharge. On one occasion, when Ertel objected to working overtime, his foreman said "none of the other inspectors wanted to work overtime" either and that "it was this CIO business and all the union talk that was creating the trouble there," and there were other "wise guys" like Ertel who "were talking about the union and trying to get the union in there." Just after Ertel was fired one of the supervisors said to him, "see, all the trouble you got in by opening your mouth and talking about the union." Of course, we cannot question the Board's decision on the credibility of witnesses. N. L. R. B. v. Poultry Enterprises, Inc., 5 Cir., 207 F.2d 522; N. L. R. B. v. Oertel Brewing Co., 6 Cir., 197 F.2d 59.
 
 
 23
 On the basis of the evidence summarized above the Hearing Examiner and the Board found that the Company discharged Ertel because of his outspoken support of UAW: an activity protected by the Act. We cannot say that they were wrong, and certainly there was a substantial basis in fact for that finding.
 
 No. 11283
 
 24
 On April 23, 1952, the Company discharged 12 employees who worked in the enamel shop of the Company's plant. The work in that shop is necessarily in close proximity to the furnaces, the temperatures of which range from 1640 to 1780 degrees Fahrenheit. The employees in this shop were also exposed to enamel dust in the air. The Company maintained an exhaust system which provided a complete change of air every 1¾ minutes. Twelve inch blower fans were also available when desired by the enamelers. In 1947 the Company installed powerful barrel fans opposite the furnaces to blow across the men and toward the faces of the furnaces. On April 7, 1952, the Company had installed and had in operation 28 such fans. On that day the Company, in order to experiment as to dust accumulation on the enamel ware, turned off the barrel fans without any advance notice to the employees. When the employees inquired about these fans they were informed that they would not be operated for one week but, because the experiment at the end of that time had not produced conclusive results, the Company decided to continue the experiment for an additional period of two weeks.
 
 
 25
 On Saturday, April 19, at a meeting of KWA, the workers in this shop decided to advise the Company that unless the barrel fans were in operation by 8:00 A. M. on April 22, the enamelers would no longer force themselves "to complete any 6-hour shift when they begin to feel sick, dizzy or otherwise feel as if they cannot take it any longer and that continuing to work without fans would be injurious to their health." A letter so advising the Company was sent by Raymond Majerus, KWA Group 3 Chairman, to the Management Committee of the Company.
 
 
 26
 The employees in the enamel shop worked in four shifts of six hours each. During the four regular daily shifts, starting with the shift which commenced work during the evening of April 21, 91 out of 190 enamelers who worked these four shifts reported ill to their supervisors before the end of the shift. It is significant to note that during the first 19 days of April a total of only 47 enamelers had failed to complete their shifts.
 
 
 27
 Of those reporting ill during the four shifts of April 21-22, 87 were sent to the Company's medical department for examination. They were given cards which were to be filled out by the examining physicians showing either that the men should be "sent home" or "sent back to the job." The doctors marked the cards to indicate that 50 of those reporting ill should be sent back to the job. Of these 50, 38 reported back for work and the remaining 12, the 12 men here in question, left the plant without completing their shifts. When these 12 reported for work on their next regular shift they were discharged. They then filed charges against the Company alleging that they had been discharged because of their union membership and activity, in violation of Sections 8(a) (1) and (3). The Board found against them.
 
 
 28
 The purpose of these 12 employees was not to strike. At their meeting on April 19 they had discussed a strike but no strike vote was taken. Some of the 12 indicated that their purpose had been to continue the same practice of quitting when they felt like it until their demands concerning the barrel fans had been complied with. Some of the 12 testified that their leaving the plant was because of their personal decision and that it had no relation to the decision made by the group on April 19. Their letter of April 19, in light of the above testimony brought out before the Board, indicated that beginning April 22, 1952, they would not complete any shift unless the Company yielded to their demands. Each of the 12 men insisted that he left the job because he was ill. Yet, as we pointed out above, an examination by a doctor of the Company's medical department showed that each was fit for work. If these men were sick, it was a personal, individual matter unless it was feigned illness to bring them within the terms of the April 19 demand.
 
 
 29
 We think the Board properly held that the action of these 12 men was not a protected, concerted action. If the men had voted to strike and, pursuant thereto, had quit their jobs until their demands had been met by the Company, the Company would have been faced with a protected, concerted action for a change in their working conditions. But the men could not insist on remaining at work on their own terms and conditions. As this court said in C. G. Conn, Ltd. v. N. L. R. B., 7 Cir., 108 F.2d 390, 397:
 
 
 30
 "We are aware of no law or logic that gives the employee the right to work upon terms prescribed solely by him. That is plainly what was sought to be done in this instance. It is not a situation in which employees ceased work in protest against conditions imposed by the employer, but one in which the employees sought and intended to continue work upon their own notion of the terms which should prevail. If they had a right to fix the hours of their employment, it would follow that a similar right existed by which they could prescribe all conditions and regulations affecting their employment."
 
 
 31
 In the Conn case, as this court pointed out, there were two courses open to the discharged employees: they could either continue to work and negotiate, or they could strike. But there, as here, the men attempted to do both and this they cannot do. It is not significant that in the Conn case the parties were in disagreement as to premium pay for overtime work while here the argument concerned conditions of employment. Both are proper subjects for bargaining and the employees could legally strike as to either.
 
 
 32
 The Supreme Court in International Union, U. A. W. A. F. of Local 232 v. Wisconsin Board, 336 U.S. 245, 257, 69 S.Ct. 516, 93 L.Ed. 651, cited the Conn case with approval as one of the decisions of the Courts of Appeals holding that not all concerted activities by employees are protected by Section 7 of the Act. In N. L. R. B. v. Rockaway News Supply Co., 2 Cir., 197 F.2d 111, 114, the court cited the Conn case as supporting the proposition that employees may not dictate the terms of their employment and that their discharge for attempting to do this is not forbidden by the Act. The 12 discharged employees insist that the Conn case is distinguishable from the instant case because there there were repeated work stoppages. But the letter which was sent by these men to the Company also threatened a course of conduct on each succeeding day until their demands were met. After receiving such information it was not necessary for the Company to keep the men on the pay roll until they had repeatedly refused to finish working their shifts. We think there was clearly a sufficient basis in fact for the finding of the Board that these 12 men were not discharged because of union membership or activity.
 
 
 33
 The order of the Board will be enforced.