228 F.2d 425
 NATIONAL LABOR RELATIONS BOARD
v.
LOCAL 169, INDUSTRIAL DIVISION, INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF
AMERICA, A.F.L.
 No. 11614.
 United States Court of Appeals Third Circuit.
 Argued Oct. 20, 1955.
Decided Dec. 9, 1955.
 
 Morris Solomon, Washington, D.C. (Theophil C. Kammholz, Gen. Counsel, David P. Findling, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen Counsel, Owsley Vose, Attys., National Labor Relations Board, Washington, D.C., on the brief), for petitioner.
 Michael von Moschzisker, Philadelphia, Pa. (McBride, von Moschzisker & Bradley, Philadelphia, Pa., on the brief), for respondent.
 Before McLAUGHLIN, STALEY and HASTIE, Circuit Judges.
 STALEY, Circuit Judge.
 
 
 1
 The National Labor Relations Board has petitioned for enforcement of its order[1] issued against the respondent, Local 169, Industrial Division, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL (union or AFL), on February 2, 1955. Since the unfair labor practices found by the Board occurred within this judicial circuit (Burlington, New Jersey), this court has jurisdiction.
 
 
 2
 The Board concluded (1) that the respondent, Through its agent John Morris, had independently violated Section 8(b)(1)(A) of the National Labor Relations Act (Act) by threatening employees of the Rheem Manufacturing Company (employer) with physical violence and loss of employment if they engaged in activities on behalf of United Steelworkers, CIO, and (2) that the respondent committed violations of Sections 8(b)(2) and 8(b)(1)(A) of the Act by unlawfully causing or attempting to cause the employer to discharge an employee, Ann Bodrog. We shall discuss each violation separately, considering first the Board's finding that the union violated Section 8(b)(1)(A)[2] through the threats of its agent Morris.
 
 
 3
 On January 14, 1954, the union was served with a charge which had been filed with the Board two days earlier. The charge alleged, inter alia, that the union violated Sections 8(b)(1)(A) and 8(b)(2) of the Act by causing the company to discriminate against Ann Bodrog and thereby and by other acts and conduct had restrained and coerced employees in the exercise of the rights guaranteed in Section 7 of the Act, 29 U.S.C.A. § 157,[3] An amended complaint, filed on April 21, 1954, contained allegations that Section 8(b)(1)(A) had been violated by the threats of Morris, although the original complaint did not.
 
 
 4
 The union contends that although the unfair labor practices by the union through agent Morris (i.e., the threats) occurred within six months of the filing and service of the charge, they did not occur within six months of the filing of the amended complaint and so the Board was barred by Section 10(b) of the Act[4] from considering the threats as violations of the Act.
 
 
 5
 The proper application of the six-months rule of Section 10(b) and its relationship to a charge, complaint, or amended complaint, has been considered by the courts on various occasions,[5] and the decisions do not support the union's interpretation of Section 10(b). In National Labor Relations Board v. Dinion Coil Co., 2 Cir., 1952, 201 F.2d 484, 491, the court summarized the effect of Section 10(b) as follows: '* * * (1) A complaint, as distinguished from a charge, need not be filed and served within in the six months, and may therefore be amended after the six months. (2) If a charge was filed and served within six months after the violations alleged in the charge, the complaint (or amended complaint), although filed after the six months, may allege violations not alleged in the charge if (a) they are closely related to the violations named in the charge, and (b) occurred within six months before the filing of the charge.'
 
 
 6
 Since in the case at bar the threats occurred within six months of the filing and serving of the charge, the only remaining question is whether the allegations contained in the amended complaint are related to the allegations in the original charge, and the question can be reasonably answered only in the affirmative. The original charge alleged that by its 'acts and conduct' the union had restrained and coerced employees in the exercise of rights guaranteed by Section 7. All that the amended complaint did was to specify more precisely what the complained of acts were. As this court said in National Labor Relations Board v. Kingston Cake Co., 3 Cir., 1951, 191 F.2d 563, 567, 'The purpose of the charge is not to define the issues to be tried with the precision that is sought normally in pleadings in law suits. The purpose of the charge is to give the Board a preliminary basis for determining whether to proceed in the investigation of the case. For this purpose, it is of course not essential that it be precise.'
 
 
 7
 The Board Properly considered the threats which occurred within the six months prior to the filing and service of the charge, and there is no question that the threats substantially supported the Board's conclusion that Section 8(b)(1) (A) had been violated.
 
 
 8
 The violation of Section 8(b)(2) and the second violation of Section 8(b)(1) (A) centered around the firing of an employee, Ann Bodrog.
 
 
 9
 Bodrog began working for the Rheem Manufacturing Company in December of 1952. Shortly thereafter she took an active part in a pre-election organizing campaign in behalf of the CIO union, which lost the election to the respondent AFL union. Respondent union's representatives were well aware of Bodrog's efforts on behalf of the CIO union. Following the election in February, the hostility of respondent union's representatives toward the supporters of the CIO union continued.
 
 
 10
 In August of 1953, Bodrog, upon the advice of her physician, went on sick leave until December 31, 1953. During that period she did not pay any union dues. Early in November Bodrog had made inquiries through a fellow employee, Alice Bublewitz, about the necessity of paying dues while on sick leave. After being informed by Bublewitz that she had to obtain a 'withdrawal card,' Bodrog, accompanied by Bublewitz, went to the union office and requested one. (Bublewitz found out about the withdrawal card through their union steward, Elsie Sarlo, who did not know what a withdrawal card was but obtained the information from some other union official.) Morris, a union official, refused to give her one, stating she would have to pay the dues which had theretofore accrued during the sick leave. Thereupon Bodrog requested permission to pay her back dues in installments when she returned to work,[6] because she had not been working and had incurred considerable medical expenses. Morris refused and insisted on a lump sum payment. During the conversation, Morris 'screamed' that Bodrog 'was not the type of person he wants in his union.' Bodrog returned to the union office a few weeks later and renewed her request but got nowhere with Morris who insisted on full payment. (Apparently, Bodrog then owed for three or four months at $4 a month.)
 
 
 11
 When Bodrog's sick leave expired on December 31, 1953, she made arrangements with the company to return to work on January 4, 1954. Also on December 31, 1953, Bodrog telephoned the union's president, Hartsough, in Philadelphia and told him about her dues problem and the events that had transpired. Hartsough told her to go to work and when he arrived in Burlington on the 6th of January he would speak to Morris and make some arrangements for her to pay her dues. When Bodrog returned to work on the 4th, she was told by her union steward to report to the union office to straighten out her dues, but since Hartsough had told her that he would make arrangements with Morris on the 6th, Bodrog decided to wait.
 
 
 12
 Without giving her name, Bodrog called the union office on the 6th and asked for Hartsough and was told that he was not there, although in fact he was. On the 7th, Bodrog did talk on the telephone with Hartsough, who had returned to Philadelphia. He told her that Morris said she had refused to pay her dues. Bodrog told Hartsough that she had not refused to pay, rather she wanted to pay but Morris had refused to accept installment payments. Hartsough then stated that he would be in Burlington again on the 13th and would make arrangements for her payments.
 
 
 13
 On the same day, the 7th, Morris notified the company that Bodrog was delinquent in dues and requested her discharge, which request the company granted.
 
 
 14
 Under Section 8(b)(2) of the Act, the only reason the union (which had a valid union-security agreement with the company) could have had for requesting Bodrog's discharge was her failure to pay the periodic dues uniformly required.[7]
 
 
 15
 Although the union claimed that the requested discharge was valid because Bodrog had failed to pay her periodic dues uniformly required, the Board disagreed and found non-uniform treatment by the union so far as Bodrog was concerned. The Board found that although the union demanded that Bodrog pay back dues in a lump sum and obtain a withdrawal card before returning to work, it accorded much greater leniency to other employees in similar situations. The union had never refused installment payments from delinquent members. In January and February of 1954, other employees of the company owed back dues, similar in amount to what Bodrog owed, and the union by agreement permitted them to pay their delinquent dues in installments. One employee who owed $28 paid $4 on account when notified in February, 1954, and had neither paid nor received a request for payment up to the time of the hearing in April, 1954. Another employee, Margaret Colvin, who was laid off in late 1953, did not request a withdrawal card until the latter part of December. When she returned to work in January, 1954, her union dues book for the months of November and December was marked 'W.C.' for withdrawal card. Colvin never paid November and December dues and has never been asked to pay. This indicated, of course, that sometimes the union did not collect dues from a non-working employee, whether or not a withdrawal card had been obtained in advance. Bodrog, however, 'owed' dues for each month that she was off work because of failure to obtain a withdrawal card.
 
 
 16
 We think that the evidence before the Board justified its conclusion that the union did not accord uniform treatment to Bodrog. This fact suffices, in our opinion, to show a violation of Section 8(b)(2)[8] since the union caused the employer to discriminate against Bodrog for some reason other than failure to pay periodic dues uniformly required.[9]
 
 
 17
 In addition to its determination that the union did not have a valid reason for requesting Bodrog's discharge, the Board determined that the real reason for her discharge was her pre-election activities and sympathies for the rival CIO union, and that a discharge under such circumstances was a violation of Section 8(b)(1)(A)[10] which prohibits a union from doing anything which would restrain or coerce employees in the exercise of their Section 7 rights.[11]
 
 
 18
 The union contends, however, that there was insufficient evidence that the discharge occurred because of Bodrog's sympathies for the rival union. We disagree.
 
 
 19
 There was evidence that the respondent maintained an attitude of hostility to sympathizers and workers for the rival union. Indeed, Morris, who told Bodrog that her kind wasn't wanted in his union, was the same individual who constantly manifested a spirit of animosity toward CIO union supporters, and it was well known that Bodrog was a CIO union supporter. It seems quite obvious that when an employee who is well known for activities and sympathies for a rival union, is discharged on the pretext of reasons which did not cause the discharge of other employees, the natural inference to any observer (including Bodrog herself) would be that 'cooperation' with respondent union leads to leniency in dues payment requirements. There was a substantial basis in the evidence for the Board's findings and conclusions.
 
 
 20
 For the foregoing reasons, the order of the Board will be enforced. A proposed decree may be submitted.
 
 
 
 [1]
 111 N.L.R.B. No. 72
 
 
 [2]
 'Sec. 8. * * *
 '(b) It shall be an unfair labor practice for a labor organization or its agents--
 '(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7; Provided, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein * * *.' National Labor Relations Act, § 8(b)(1)(A), 29 U.S.C.A. § 158(b).
 
 
 [3]
 The charge read in part:
 'On or about January 8, 1954, the above-named labor organization caused Rheem Manufacturing Company to discriminate against me by terminating my employment because I was not a member in good standing in the above-named labor organization.
 'By the acts set forth in the paragraph above, and by other acts and conduct, it, by its officers, agents and employees, interfered with, restrained and coerced its employees in the exercise of the rights guaranteed in Section 7 of the National Labor Relations Act.'
 
 
 [4]
 The pertinent part of Section 10(b) reads: 'That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made * * *. Any such complaint may be amended by the member, agent, or agency conducting the hearing or the Board in its discretion at any time prior to the issuance of an order based thereon.' National Labor Relations Act, § 10(b), 29 U.S.C.A. § 160(b)
 
 
 [5]
 See National Labor Relations Board v. Epstein, 3 Cir., 1953, 203 F.2d 482, 485; National Labor Relations Board v. Kingston Cake Co., 3 Cir., 1951, 191 F.2d 563, 567; Cusano v. National Labor Relations Board, 3 Cir., 1951, 190 F.2d 898, 903-904; National Labor Relations Board v. Kohler Co., 7 Cir., 1955, 220 F.2d 3, 6-8; National Labor Relations Board v. Osbrink, 9 Cir., 1954, 218 F.2d 341, 345-347, certiorari denied, 1955, 349 U.S. 928, 75 S.Ct. 770; National Labor Relations Board v. Talladega Cotton Factory, Inc., 5 Cir., 1954, 213 F.2d 209, 214-215, 40 A.L.R.2d 404; National Labor Relations Board v. Pecheur Lozenge Co., 2 Cir., 1953, 209 F.2d 393, 401-402, certiorari denied, 1954, 347 U.S. 953, 74 S.Ct. 678, 98 L.Ed. 1099; National Labor Relations Board v. Brown & Root, Inc., 8 Cir., 1953, 203 F.2d 139, 146; National Labor Relations Board v. Kobritz, 1 Cir., 1951, 193 F.2d 8, 14-16; National Labor Relations Board v. Westex Boot & Shoe Co., 5 Cir., 1951, 190 F.2d 12, 13
 
 
 [6]
 At that time Bodrog expected to return to work in several weeks but actually was not able to do so until the early part of January, 1954
 
 
 [7]
 So far as § 8(b)(2) is concerned, the real reason for discharge is immaterial so long as it was not for failure to pay the uniformly required periodic dues
 
 
 [8]
 Section 8(b)(2) is violated when the union causes or attempts to cause the employer to violate § 8(a)(3) or wrongfully causes or attempts to cause the employer to discriminate against an employee. Since we conclude that a clear violation of § 8(b)(2) occurred under the 'discrimination' aspect, there is no reason to consider questions raised as to the other aspect
 
 
 [9]
 The union has argued that since all employees were charged the same amount of dues per month, dues uniformity was present. But the uniformity requirement would be meaningless if it meant only that. Even though each employee owes the same amount, when and how he is required to pay can make a significant difference to him, and difference of treatment in these aspects could be an instrument on the union's part to insure co-operation. Also, we do not mean to indicate that in all situations a union is prohibited from relaxing its rules for individual cases. But here it seems clear that the Bodrog case was an isolated one, and no reason existed for failure to follow its theretofore uniform policy of leniency. The union suggests that some people have poor credit but do not indicate that any such factor was present in Bodrog's case
 
 
 [10]
 See note 3, supra
 
 
 [11]
 'Sec. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a)(3).' National Labor Relations Act, § 7, 29 U.S.C.A. § 157