·NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

HOUSTON DISTRIBUTION SERVICES, INC., and Southwest Warehouse Service, Respondents.

No. 77–1486.

United States Court of Appeals, Fifth Circuit.

May 19, 1978.

Elliott Moore, Deputy Associate Gen. Counsel, Paul J. Spielberg, Supervisor, Vivian A. Miller, Atty., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Assoc. Gen. Counsel, N.L.R.B., Washington, D. C., for petitioner.

David T. Maddox, Robert T. Sabom, Houston, Tex., for respondents.

Before THORNBERRY, GOLDBERG and CLARK, Circuit Judges.

THORNBERRY, Circuit Judge:

This is an application by the National Labor Relations Board for enforcement of its order issued against Houston Distribution Services, Inc. (Houston Distribution) and Southwest Warehouse Services, Inc. (Southwest). The Board found that the respondent, a single employer consisting of the two companies, violated Sections 8(a)(3) and (1) of the National Labor Relations Act, 29 U.S.C. § 151 et seq., by refusing to hire three employees formerly employed by its predecessor, Shipper's Transportation & Storage, Inc. (Shipper's), and by discharging four employees in order to avoid bargaining with the Union.[1] The Board further found that the respondent was a successor employer and that a majority of its employees in an appropriate unit had designated the Union as their collective bargaining representative and that the respondent had refused to bargain with the Union in violation of Sections 8(a)(5) and (1) of the Act. The Board's decision and order is reported at 227 N.L.R.B. No. 152 (1977). We grant enforcement.

I.

Southwest complains that the Board proceeded against it without a charging party

ever naming Southwest. Southwest contends that the Board's action is in violation of 29 U.S.C. § 160(b) which requires the Board to issue a complaint pursuant only to a charge made by a charging party.[2]

The original charge named Houston Distributing and the Board issued a complaint against it. At the hearing before the Administrative Law Judge (ALJ), it was discovered that although the employees thought they worked for Houston Distribution, the actual employer was Southwest.[3] After this became apparent, the ALJ amended the complaint to include Southwest.

While Southwest does not contend that the ALJ is without power to amend the complaint, it urges that the ALJ cannot do so without an underlying charge specifically naming Southwest. As Southwest correctly points out, the Board is without power to initiate a proceeding without benefit of an underlying charge, NLRB v. Indiana & Michigan Elect. Co., 318 U.S. 9, 63 S.Ct. 394, 87 L.Ed. 579 (1943); NLRB v. Westex Boot & Shoe Co., 190 F.2d 12, 13 (5 Cir. 1951); however, the charge when made is not to be strictly construed. In Texas Industries, Inc. v. NLRB, 336 F.2d 128, 132 (5 Cir. 1964), we said:

It is established that this section precludes the Board from issuing a complaint on its own initiative and that a charge is a prerequisite to the institution of proceedings before the Board. N.L.R.B. v. Kohler Co., 7 Cir. 1955, 220 F.2d 3. However, the charge is not a formal pleading, and its function is not to give notice to the respondent of the exact nature of the charges against him. N.L.R.B. v. Fant Milling Co., 1959, 360 U.S. 301, 79 S.Ct. 1179, 3 L.Ed.2d 1243; Consumers Power Co. v. N.L.R.B., 6 Cir. 1940,

---

1. Teamsters Freight, Tank Line and Automobile Industry Employees Local Union No. 988.

2. Section 10(b) of the Act provides:
   Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board . . . shall

have power to issue . . . a complaint stating the charges in that respect . . ..
29 U.S.C. § 160(b).

3. Houston Distributing was wholly owned by Southwest.

113 F.2d 38. This is the function of the complaint. The charge rather, serves merely to set in motion the investigatory machinery of the Board. It is largely for the benefit of the Board, not the respondent, so that it may intelligently determine whether and to what extent an investigation is warranted. Consequently, the Board has considerable leeway to found a complaint on events other than those specifically set forth in the charge, the only limitation being that the Board may not get 'so completely outside * * the charge that it may be said to be initiating the proceeding on its own motion * * *.' *N.L.R.B. v. Kohler Co.,* supra. See also *N.L.R.B. v. Reliance Steel Products Co.,* 5 Cir. 1963, 322 F.2d 49; *N.L.R.B. v. Raymond Pearson, Inc.,* 5 Cir. 1957, 243 F.2d 456.

■ We do not believe that the addition of the correct corporate entity is so completely outside the original charge that the Board could be said to have initiated a proceeding of its own motion. The distinction is between the total absence of a charge and a charge made, although not perfect in every particular. Workingmen are not required to wander the maze of corporate structure.

## II.

The respondent next brings forward the obligatory substantial evidence point and an objection concerning the proper test to be applied in refusal to hire cases.

### REFUSAL TO HIRE

Gary R. Stillwell is the owner of Southwest which in turn owns Houston Distribution. Stillwell was in the moving and storage business until April 1974 at which time he sold the moving part of his business and remained in the storage business. He operated Southwest which had two employees and was non-union. Stillwell was also a consultant for Weingarten Realty which owned Shipper's. Weingarten desired to sell its interest in Shipper's and Stillwell formed a new company, Houston Distributing, to take over Shipper's operation. Shipper's had approximately twenty-five employees and all were told that applications for employment would be available on February 3. Stillwell also ran a newspaper advertisement seeking qualified employees. Shipper's former employees were union members.

Nine former Shipper's employees were hired by Southwest. Six new employees were also hired. Former Shipper's employees Eugene Plater, Emmett Lewis, and Phillip Ware were not hired. The Board found that these men were not hired because of union animus.

### THE PROPER BURDEN OF PROOF

■ The respondent urges that the Board used the wrong standard in ascertaining the burden of proof in refusal to hire cases. The respondent insists that the only issue which the Board should have addressed was whether the failure to hire the three former employees was "solely" because of their affiliation with the Union. In *Howard Johnson Co., Inv. v. Hotel Employees,* 417 U.S. 249, 94 S.Ct. 2236, 2243 n.8, 41 L.Ed.2d 46 (1974), Mr. Justice Marshall stated, "Thus, a new owner could not refuse to hire the employees of his predecessor solely because they were union members or to avoid having to recognize the union."

We do not think this comment was an attempt to formulate a test for burden of proof in successorship cases. Rather, this is a clear example of impermissible conduct on the part of a successor employer. We do not think that quotation from *Howard Johnson* addressed the case in which the employer had both permissible and impermissible motives in refusing to hire a predecessor's former employees. Indeed, after citing with approval two cases, neither of which adopts a "sole motivation" test, Mr. Justice Marshall further states, "There is no suggestion in this case that Howard Johnson in any way discriminated in its hiring against the former Grisson employees because of their union membership, activity, or representation." *Id.*

If the Board were to find for the employees only when union animus is the sole reason for the refusal to hire, the Board could seldomly be upheld. We believe that the Board's task in these cases is to find substantial evidence of union animus. *NLRB v. Foodway of El Paso*, 496 F.2d 117, 119 (5 Cir. 1974); *K. B. & J. Young's Super Markets v. NLRB*, 377 F.2d 463 (9 Cir.), *cert. denied*, 389 U.S. 841, 88 S.Ct. 71, 19 L.Ed.2d 105 (1967); *Tri State Maintenance Corp. v. NLRB*, 132 U.S.App.D.C. 368, 408 F.2d 171 (1968).

## SUBSTANTIAL EVIDENCE

■ We are persuaded that the Board's conclusion that the three former workers were not hired as a result of a plan to avoid dealing with the Union is supported by substantial evidence.

■ While it is plain that Southwest was under no obligation to hire the entire workforce of Shipper's, *Tri State, supra,* 132 U.S.App.D.C. at 370, 408 F.2d at 173, or to hire exclusively from the pool of former workers, we think that Southwest's behavior toward this pool gives the Board adequate reason to hold that Southwest refused to hire the three employees in furtherance of a plan to avoid bargaining with the Union. First, it is undisputed that Stillwell was concerned about the employee quality at Shipper's warehouse. Given the twenty-five former workers to choose from, good business judgment would dictate that Southwest hire only the best workers from Shipper's. Nevertheless, Southwest never inquired about the quality of the workers, even though such inquiry could have easily been made. Second, the reasons advanced by Southwest for not hiring the three men justify the Board in imputing bad motive to Southwest. Southwest contends that Plater, Lewis, and Ware were rejected out of hand because they could not report to work immediately, their applications were either

incomplete, ambiguous about the job sought, or without indications of previous warehousing experience. Although their applications disclose that they were all willing to report for work no later than February 4, others similarly situated obtained employment from Southwest. The Southwest hiring agent knew that all of the applications were made by former Shipper's employees and that Shipper's had employed only warehousemen. It is therefore inconceivable that the hiring agent did not know that the potential employees were all experienced warehousemen regardless of any ambiguity in their applications. Furthermore, the agents made no attempt to question any of the applicants about their job history, skills, or job preference. We think that the Board was supported by substantial evidence on the record taken as a whole.[4]

## DISCHARGE OF FOUR EMPLOYEES

■ It is settled that an employer "may discharge for good cause, bad cause or no cause at all, without violating the Act, as long as his motivation is not anti union discrimination and the discharge is not punitive for legitimate concentrated activity protected under the Act." *Firestone Tire and Rubber Co. v. NLRB*, 449 F.2d 511, 513 (5 Cir. 1971).

■ The proof adduced at the hearing shows that Wilford Davis, Curtis Mack, Raymond Mills, and Nathaniel Jones were discharged in the middle of a pay period without any misconduct proximate to their discharge. More telling is the fact that a Union meeting had been scheduled to follow shortly after the discharges. This timing evidence may give rise to the inference that the discharges were motivated by anti-unionism. *NLRB v. Central Power & Light Co.*, 425 F.2d 1318, 1322 (5 Cir. 1970). The respondent points to the fact that it had

---

4. The Board also points out that Southwest placed a newspaper advertisement seeking qualified employees. While such an advertisement, logically, could be a part of an anti-union plan, we do not think that the newspaper advertisement in itself can represent anti-unionism. The employer is under no obligation to hire from the pool of former Shipper's employees. Certainly, an employer who is under no obligation to hire from a particular pool of employees may seek qualified employees from the public at large.

good cause to fire the four workers. However, the mere existence of good cause for the discharge is not enough to vitiate the Board's finding unless the good reason was a motivating cause of the discharge. *Central Power & Light Co., supra; NLRB v. Southeastern Stages,* 423 F.2d 878, 879 (5 Cir. 1970). This court has not adopted the "but for" test for determining union animus advanced by the First Circuit in *Coletti's Furniture, Inc. v. NLRB,* 550 F.2d 1292 (1 Cir. 1977). *See Federal-Mogul Corp. v. NLRB,* 566 F.2d 1245 (5 Cir. 1978).

■ At this point the respondent objects to what may be fairly termed a remarkable colloquy between it and the ALJ. In order to show that some of the discharged employees were not good employees, the respondent called Brett Griffin to testify before ALJ Joel Harmatz. Griffin was hired by Southwest as a result of the newspaper advertisement placed by Southwest. He was termed throughout this proceeding as a "college student" although it appears that he was a full time employee of Southwest. Griffin is a union member, although not a member of the relevant union in this proceeding and he is white. The following are excerpts from the colloquy:

> JUDGE HARMATZ: I would also note for the record that Mr. Griffin and Mr. Tremble (phonetic) are Caucasian, and that all of the alleged discriminatees are black people.
>
> MR. MADDOX: For clarification of counsel, what is the relevance of that point, your Honor?
>
> JUDGE HARMATZ: It's something that suggests the possibility of bias, to be quite frank. It's a possibility. I don't know whether it exists, but I think that people, unfortunately, have allowed their subjection to their conditioning pattern in a community to influence their judgment as to people who do not particularly come from their racial background.
>
> It's one of the factors that I consider this type of testimony to be strongly prejudicial about, which I am not going to accept as objective evidence on which I necessar-

ily would have to make a credibility resolution.

. . . . .

> JUDGE HARMATZ: I think this is a matter of practical knowledge, and it relates to the competency of this man's testimony.
>
> It relates to his capacity. It has some relationship from my perspective of considerations that bear upon whether testimony is competent, and whether a particular witness has a capacity to give such testimony.
>
> And I think it is relevant, and I want anybody who reviews me to take note of that circumstance.

. . . . .

> .I have to consider the possibility of race influencing the objectivity of his judgment.

We have done as Judge Harmatz asks and we, as a reviewing court, have taken note of the fact that Judge Harmatz has held, among other things, that a witness' competency to testify can be based on the color of his skin. We are amazed.

The National Labor Relations Board is required to conduct its proceedings "so far as practicable" in accord with the federal rules of evidence. 29 C.F.R. §§ 101.10(a), 102.39 (1976). The word "practicable" is not a carte blanche to ignore the rules of evidence. This is a term with meaning and substance. There is no conceivable reason why NLRB proceedings should not be conducted under the accepted rules of competency. Rule 601 Federal Rules of Evidence states:

> Every person is competent to be a witness except as otherwise provided in these rules. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the competency of a witness shall be determined in accordance with State law.

*See NLRB v. Decker & Sons,* 569 F.2d 357 (5 Cir. 1978). We find it difficult to countenance such an egregious violation of the federal rules and only decline to refuse

enforcement of the Board's order because of the cumulative nature of the proposed testimony.[5]

### III.

■ Finally, the Board found that the respondent, as a successor employer, violated Section 8(a)(5) of the Act by refusing to recognize and bargain with the Union. Southwest contends that it is not a successor employer and is therefore not required to bargain with the Union. *Howard Johnson Co. v. Hotel and Restaurant Employees and Bartenders Int'l Union,* 417 U.S. 249, 261–62, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974); *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 184 n.6, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973); *Burns International Security Services, Inc. v. NLRB,* 406 U.S. 272, 280–81, n. 5, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972).

The Board argues that Southwest comes within the successorship doctrine because the essential nature of the business did not change[6] and more than one-half of Southwest's employees were union members.

The Board contends that the relevant measuring day to determine if the company had a majority of Union members is the initial day of operations. Southwest, on the other hand, contends that the relevant measuring day is after a full complement of employees had been employed and a shakedown period completed. The respondent urges either a six or nine week shakedown period. Southwest relies on the following statement in *Burns, supra,* 406 U.S. at 294–95, 92 S.Ct. at 1586:

> In other situations, however, it may not be clear until the successor employer has hired his full complement of employees that he has a duty to bargain with a union, since it will not be evident until then that the bargaining representative represents a majority of the employees in the unit as required by § 9(a) of the Act, 29 U.S.C. § 159(a).

In *Pacific Hide & Fur Depot, Inc. v. NLRB,* 553 F.2d 609 (9 Cir. 1977), the Ninth Circuit in determining the relevant measuring date for successorship liability examined this passage from *Burns.* In rejecting the argument similar to the one advanced here by the Board, the court found that in some business situations, the first day of operations is not the controlling date for determining successorship liability and that in some cases the full complement of employees is not reached until after a period of business operations. We believe that the Ninth Circuit has correctly interpreted this passage from *Burns.* Practical business necessity requires that some new employers be given some time to change the character of the new business. The first day of operations does not, in every case, freeze time and solidify existing relations.

Using the *Pacific Hide* approach Southwest argues that it needed an opportunity to clean, organize and inventory the new facility as well as integrate the new facility with the old one before reaching a full complement of employees. Southwest contends that about sixty days after it took over operations the shakedown was complete and on that date since there were seven non-union workers and only four union workers there was no duty to bargain with the union.[7] *Pacific Hide* is in point,

---

**5.** It is further worth noting that distinguished historians from various viewpoints all agree that one of the primary reasons for the fourteenth amendment was the existence of "Black Codes" in some states which frequently prohibited blacks from testifying against whites. Agreement is universal that these codes were unconstitutional and it has long been thought that testimonial competency cannot be constitutionally based on race. Of course, the fourteenth amendment is directed at the states, but the same would hold true in an NLRB proceeding because of the fifth amendment. *See* R. Berger, Government by Judiciary, 26 (1977); H. Hyman, A More Perfect Union, 420 (Sentry Ed. 1973).

**6.** We agree that the employing industry remained substantially the same as its predecessor. *NLRB v. Zayre Corp.,* 424 F.2d 1159, 1162 (5 Cir. 1970).

**7.** In *Pacific Hide,* the Ninth Circuit found it unnecessary to determine the exact measuring day. Given our disposition of this case, we too, decline to name an exact measuring day. Our holding is that the measuring day in every case is not the first day of operation.

except for one very important distinction that the respondent neglects in its calculations. In *Pacific Hide* there was no improper refusal to hire and no improper firings. In the present case three workers were not hired because of Union bias and four were fired because of Union bias. As we stated in *NLRB v. Foodway of El Paso,* 496 F.2d 117 (5 Cir. 1974) at 120:

> Foodway next contends that substantial evidence fails to show that the Union represented a majority of the employees and that it was therefore under no duty to bargain with the Union. It is manifest that but for Foodway's discriminatory refusal to offer employment to Allied's unit employees, the Union would have continued to enjoy a majority representative status. We decline to permit an employer to rely upon its own wrongdoing and thus avoid its legal responsibilities. *See Burns, supra,* at 280, n.5.

Including the seven Union members into the calculations, it is apparent that the Union represented more than one-half of the respondent's employees and the respondent has a duty to bargain with the Union.

ENFORCED.